Good morning, Your Honors, and may it please the Court, I am Joseph Brooks from the FDIC's Appellate Litigation Unit. I'm going to try and reserve three minutes for rebuttal. In Bob Richards, this Court enunciated a default rule under which parent corporations hold their subsidiary share of tax refunds as an agent or trustee. The question presented is whether a tax-sharing agreement entered into by IndyMac Bank and its parent holding company is an explicit differing agreement that overrides that default rule and gives to the holding company more than $55 million in tax refunds that would otherwise belong to the bank. Let me ask you a question right as we begin. I didn't see, and I still, I read it again yesterday, I didn't see any place in here where you've ever pled that this agreement, amended tax-sharing agreement, is at all ambiguous. Well, Your Honor, we argued in the alternative below, and indeed the I'm not talking about what you did below, I'm talking about what you did in front of me. Well, Your Honor, I would point out that perhaps the two most critical cases other than Bob Richards itself I'm not asking you to tell me, did you ever allege or say to me in your briefing that this agreement is ambiguous? We didn't say ambiguous, Your Honor, no. So if you didn't say ambiguous, then I am left, under California law, with construing this agreement as a clear and unambiguous agreement and I'm to interpret the agreement. Wouldn't you suggest that? Absolutely not, Your Honor. What we did say, and we said it multiple times in the brief and the statement of issue, I believe, and elsewhere, is that the agreement is silent on the issue that's covered by the default rule. Well, silent, that doesn't make it ambiguous. If I can suggest that it isn't silent or if I read the agreement and I don't find it silent, then I have to read the terms of the agreement, correct? I don't believe so in this instance, Your Honor, because we have an established default rule. And under both Bob Richards and, more importantly, the recent Supreme Court decision in McCutcheon, when an agreement is silent on an issue that is the subject of a default rule, the court applies the default rule. All right. So what you're saying is it's not necessarily ambiguous, but if silent, I go to a different rule. That's correct, Your Honor. All right. I just wanted to make sure. And the reason for that is simple, Your Honor. Why does this tax-sharing agreement not constitute an express or implied agreement to take this completely outside the scope of Bob Richards? Well, it doesn't constitute an express agreement for the reason that it does not address the subject. If I might suggest, it's a very quick hypothetical. If the holding company and the bank had entered into an agreement that said, when they file consolidated returns, the parent company will pay the postage, that clearly would not take $55 million in tax refunds and transfer them to the holding company. The reason why is because that agreement would not address that issue, who owns the tax refunds. This agreement doesn't either. This is an agreement that addresses allocation of refunds. But as in Bank United and as in NetBank, two cases decided by the 11th Circuit since briefing closed, they've been brought to the Court's attention in 20HA letters. In both of those cases, the courts looked at tax-sharing agreements. In one of those cases, the NetBank case, they looked at a tax-sharing agreement that is virtually identical to this one. It includes every material provision. And what they said was neither of those agreements explained whether or not the holding company owned the refunds in the time between when it received them from the IRS and before it transmitted them. And therefore, it said, those agreements do not address the issue. That's precisely what happened here. Your Honor, Bob Richards says an explicit agreement. What the Bankruptcy Court and the district court here did was they said, what we have here is language which we, the courts think, creates a debtor-creditor language. And that, they said, implicitly, implicitly overrides Bob Richards. Implicit is the opposite of explicit. But more importantly, those agreements do not create a debtor-creditor relationship. Indeed, what the Bankruptcy Court report did here was it said in arriving at the conclusion that there was a debtor-creditor relationship, that it was relying on two cases, the lower court decisions in NetBank and Bank United. It said that those two decisions were, quote, directly on point, unquote. And it cited or quoted those two decisions 25 times. Since the briefing closed in this case, the 11th Circuit has reversed both of those lower court decisions and published decisions, and in each instance, it soundly rejected the debtor-creditor analysis. It went through each of the three points that the district court and Bankruptcy Court relied upon here. And it said, first, the words. Well, if we go to Henry NetBank, and I know where you're going, there are, there is a provision in it that is different than is in this agreement. That provision is the agreement is intended to allocate the tax liability in accordance with the interagency statement of income tax allocation in a holding company structure. That's right in the agreement. That's not in our agreement. Your Honor, that provision is not in our agreement, but there are three reasons why this Court should still look to the interagency policy statement. First, there is a provision in our agreement. It's in Section 10A of our agreement, and it says that the parties intend that rules, small r undetermined, undefined term. Rules promulgated by the Office of the OTS and also the FDIC are intended to be complied with, and to the extent this agreement is contrary to those rules, the agreement is null and void. Secondly, in NetBank, the 11th Circuit said not just the reference in the contract. They said the interagency policy statement is the background against which this agreement was adopted. I understand your argument, but it seems adequately clear that if I read language and I could read the total statement as to what it says, it absolutely suggests that a parent company that receives the tax refund from the taxing authority obtains these funds as agent for the consolidated group on behalf of the group members. Accordingly, an organization's tax allocation agreement or other corporate policy should not propose to characterize refunds attributable to a subsidiary deposit institution that the parent receives from a taxing authority as the property of the parent. I would argue that this is a statement that is intended to allocate the tax liability in accordance with the interagency statement right in the agreement, which is not in our agreement. Your Honor, the language you just quoted is not in the agreement. It's in the interagency policy statement. Well, I understand that. But what I'm saying is this is a statement and we have allocation is intended to allocate the tax liability in accordance with the interagency statement, and now I've read the statement. That would seem to be just exactly what you need. What I'm really saying is we don't have that here. Two points, Your Honor, and I want to say them in reverse order. We don't need it here, but we have it here, and here's why. In addition to the fact that there is a reference to rules, and it's just strange credulity to say that these parties in a heavily regulated environment would enter into an agreement at the behest of their regulators and then disregard a policy statement that their regulators issued on the very subject of that agreement. So it's the background against which it was intended to. But beyond that, there is an admission, Your Honor, in the brief filed in this case. At pages 11 through 12 of Bancor's brief, the following language appears. Quote, banking regulators have, quote, encouraged, unquote, parent and subsidiary entities, quote, to enter into a written comprehensive tax allocation agreement tailored to their specific circumstances, unquote, so they can, quote, address certain issues common to consolidated groups, unquote. The language within the quotes is from the interagency policy statement, and here's the kicker, the very next sentence in their brief at page 12. The February 6, 2003, TSA is such an agreement, unquote. In other words, here we have not only the reference to rules promulgated by the FDIC, not only the fact that the interagency policy statement is the background against which this agreement was adopted, but we also have an admission in the brief that this contract is the very contract, the very sort of contract that's being referred to in the interagency policy statement and therefore is within the language that you quoted earlier. Now, my second point, Your Honor, would be in NetBank, they reached the conclusion that the contract was silently ambiguous. They were not in the Ninth Circuit. They then went to state law. They then went to interpret the contract. But interestingly enough, the following language appears in NetBank, which, again, has a contract with, it's got, I'm not sure, but it's got substantially similar provisions on each page. I've gone through those, but that's, I mean, my biggest problem, and that's why I want to hear you out on this is that it seems to me that that agreement covers exactly the situation that we would have in our agreement, but it's not covered. And I appreciate your citation to the part of the agreement you think covers it, and I'll let counsel respond. But the problem is that when, if, first of all, if I've got an unambiguous agreement, I've got to interpret this agreement as it is, unless you can say it's silent, and then I might be able to go out elsewhere. But if I've got to interpret this agreement and it is unambiguous, then I've got to, I'm stuck with the terms thereof, and I don't have the same terms that the Georgia court had. Well, Your Honor, keep in mind, they used that provision not to determine if there was an ambiguity. They used that provision. I know, not to determine if there was an ambiguity, because it isn't. It said it right there. It's intended to allocate along with the interagency statement, which then the statement becomes a part of that agreement because I gave you what the statement says. If the agreement says it's intended to allocate it in accordance with the statement, then it seems to me the statement becomes a part of the agreement. Well, Your Honor, a critical point is the Netbank court also said, quote, the outcome of the instant case, the Netbank case, would not be different if the Bob Richards rule were applied, unquote. And that appears at 729 F. 3rd at 1347 note 3. Now so going back to Bob Richards, I hate to interrupt you, but I just have one little question. I think you need to get off my head. I want to hear it. I think you indicated Bob Richards requires an explicit agreement, but I'm wondering about the language in Bob Richards that says normally there's an explicit agreement or where an agreement can be fairly implied. Sure. Now, it strikes me that explicit and implication are different things than I think you said a moment ago. Well, you can't imply them. It's got to be explicit. Your Honor. That was your first comment about Bob Richards, and I'm kind of wondering about how that. Sure, Your Honor. It's very simple. As we point out in the brief, we cite the Marvin v. Marvin case. I'm sure there are many more California cases. An implied agreement, that's the language. The language in Bob Richards is not implicit or implied. It's an implied agreement or an explicit agreement. Or excuse me, an express agreement. It's an explicit express agreement or an implied agreement. As we argued in our brief, as we pointed out, under California law, an express agreement is an agreement by words, whether written or oral, and an implied agreement is an agreement based solely on conduct, conduct of the parties, which indicates an agreement aside. You cannot have an implied express agreement. You cannot imply something from an express agreement. They're mutually exclusive legal concepts. And when the Court says, for example, if we could. So unless it says you're reading Bob Richards, unless it says it absolutely explicitly says this is it, one can't read it for its unambiguous language and say, well, it's perfectly obvious this is what they mean. So nothing can be implied. For example, we don't know what explicit means. We don't know what agreement means because we can't go to dictionaries and imply from our knowledge of language. Well, I think there's. Excuse me. Not exactly. I think there's implied and there's construed. But what I would say is look at the McCutcheon case out of the Supreme Court, the recent case. Same type of issue. You had an agreement. There's a health plan, but as the Supreme Court said, that's a contract. The contract appeared to address the issue there. Once funds are paid by the insurance plan, the insurance plan, excuse me, and those funds are subsequently covered by the party who received them, the insurance plan can recover them all back, period. Okay? And looking at that in a vacuum, the court might say, well, that seems pretty clear. But the court didn't look at it in a vacuum because there is a default rule. And a default rule is a rule that applies in either one of two circumstances. One, where there was no contract, or two, as in McCutcheon and as in some of these tax refund cases, where there is a contract that does not address the subject of the default rule. That's this case. And what the court said is where the contract is silent on the subject of the default rule, the default rule governs. In this instance, Your Honor, certainly within this circuit, any sophisticated parties who are dealing with tax refunds at the level of $55 million and with regulated banking entities would know that the rule in this circuit is there is a default rule. If your contract does not address this issue, this default rule applies. And the default rule is crystal clear. No issue here about allocation of these refunds. No issue here about who paid all the taxes, suffered all the losses. The issue here is during that short period of time when those refunds are sent by the IRS to the holding company, not because the parties want them to be sent to the holding company, but because the IRS regulations require that. The holding company is serving as nothing but a collection agent. It's receiving the refunds because the government requires it to receive them. And that short period of time before it turns around and pays them, does it take ownership of those or does it hold them in a trust? The rule goes back 150 years. Whenever money is handed to a party for the sole purpose of being a conduit to transmit that money to a third party, the party who receives that money holds it in trust. And in Bob Richards, this court said that rule applies whenever a parent corporation receives the refunds. Now, these parties put together ñ Your time is up, Counselor. I think we got your point. Thank you, Your Honor. Thank you, Your Honors, and may it please the Court. My name is David Stern and I represent the trustee. I'm going to begin where my colleague didn't really want to begin, which is the contract itself, because I think that's obviously where the analysis begins and, in my view, where it ends. This is a contract that specifically chose California law. And if one takes the application of California law to a statement in a contract, and it begins at the very beginning, and I know that the FDIC considers this to be one of its most important points because it says ñ it quotes it several times, the preamble, that the bank is supposed to make and receive payments as if it were filing returns separate from Bancorp. It says it over and over. The key here is that it talks about making and receiving payments. It doesn't say holding it in trust. And California law, which is the choice of law under 7B here, is very clear. It's clear in decisions by this Court, coupon clearing, U.S. v. Rodriguez, U.S. v. Lawson. It's clear in cases coming out of the California courts, Lonely Maiden, Petherbridge, even Del Costello, which is a case involving a tax refund, same issue. California law is real clear. And Lawson, in its concluding phrase, says it, and that is, in the future if the government wishes to claim the actual proceeds, it need only contract for that right. If you're going to have an expressed trust, you're going to say it. It's very easy to say. There is a provision in the tax agreement that explicitly designates Bancorp as the agent. Right. What do you do with that? Well, I think what you can do with that is actually look at it in context, which is the way California courts always do. What is the agency that is given there? It's not the agency for me to take a watch and give it to somebody else who's going to deliver it, the principal agent type relationship. The agency there is very specific. What it does is it says that in your dealings with the Internal Revenue Service, you can pretty much do anything, Bancorp. You can go and decide not to receive a refund and to roll it forward. You can make decisions about the tax return. So while sometimes the term principal and agent has fiduciary connotations, in this particular context it's much like the agency agreement or the attorney-in-fact agreement that I give to my lender on my home who has the right to do all sorts of things to protect its interests, not mine. That's the sole discretion argument. I mean, because they have sole discretion somehow that makes it more of a creditor-debtor relationship? It does. It does because really what has to happen in California to have a non-creditor-debtor relationship is that there has to be an exercise of control. My distinguished colleague talked about the conduit or delivery vehicle collection agency. If the contract said when you receive the refund, you know, call us up and ask us what we want done with it, that's one thing. If it says you're to put it into a segregated account, that's another thing. But this is a situation where, to use Judge Easterbrook's very colorful phrase, the Bancorp could have bought, you know, lottery tickets or uranium stocks. It just had a debtor-creditor relationship. And as in Lawson and in Rodriguez, whatever it did with it, it wasn't the bank's money. The bank got the money when, at the time that it got paid, 15 business days or 15 calendar days thereafter. And in fact, interestingly, the agency language is important because what the Bancorp could do is say, don't give us a refund, roll it forward. Perfectly reasonable approach to deal with estimated taxes and the like. And interestingly, in that situation, Bancorp would owe money to the bank 15 days later if bank would have gotten a refund. So the refund is completely untethered from the ultimate payment. And that's what critically makes this case not a trust case but a debtor-creditor case. Are you finished? No. All right, colleague. Would you please concentrate, then, in In re Net Bank? Because it seems to me that what counsel has really suggested is you've got a case dead on here, Judge. Apply it. I gave him a couple of things that I thought differently and had him respond. Now I want you to respond to what he suggested to me. In our view, the different contracts, different laws, different results. And the different contract here was pointed out, as we indicated in our response to their 28-J letter, by the FDIC in their brief to the 11th Circuit. And what they said is this case is different from IndyMac because it specifically incorporates the interagency policy statement. So stipulated, it is different for that reason, and that's a big difference. Words matter. Contracts matter. Different words, different results. Possibly different laws. Well, I'm familiar with that. What do you do with that part of your contract he then cited to suggest that you have the same kind of language in your agreement? You know, there are two responses to that. One is that regulatory agencies, there's obviously statutes, there are rules that are published in the Federal Register and the like, and there are policy statements. This said rules. It didn't say policy statements. Further, the lower court, and it's in the report and recommendation, I believe it is in the excerpts of record at page 70, cites the two cases, one from this court and one from the California courts. It's Cariaga is one from this court. Chan is one from the California Court of Appeals. And what it says is if you want to incorporate a document by reference, you must do so specifically. And, you know, this really takes us back to a 1974 U.S. Supreme Court case even. You know, again, if the Mahon v. Stowers case, that's the kind of case in which Congress didn't have a law that said you're going to hold it in trust. The Supreme Court said, therefore, in a bankruptcy setting, it's not held in trust. Congress the next year amended the statute, said it's going to be held in trust. So if you want to do it, there are ways to do it. And, in fact, I'm not sure if it was the lower court that said, you know, basically a first-year lawyer should be able to do it. This is, as my colleague said, an important document. If you wanted to say it was a trust relationship, just say it. If you want to incorporate the interagency policy statement, just do it. But this case did neither. And I think that what we have to do is I don't think there's a hole in this statute. I don't think there's a gap. I don't think there's an ambiguity. And the reason I don't is because I think that whatever ambiguity, gap, hole, or whatever you want to call it exists, is resolved by the default rules that the State of California has followed for more than a generation, going back to Judge Marcus Coffman's opinion in Petherbridge in 1978. That case is very clear as well. You want to trust, say it. This contract doesn't say it. Therefore, no trust, debt, or creditor relationship. Bob Richards, can you respond to how important Bob Richards is to this case? A few things about Bob Richards. First of all, Bob Richards was a case that talked about there being no contract. To my mind, that's sort of the end of the story. Secondly, it's federal common law. There's really no reason to apply federal common law here. The contract says California law. And this Court, as well as the U.S. Supreme Court, has consistently held that federal common law is something you resort to very infrequently. So talking about it being a background rule is, frankly, inconsistent with jurisprudence, starting with the O'Melveny case, through Atherton, through Leto Financial, and is inconsistent with the contract itself. So I don't think that Bob Richards has any place here, and the notion that that opinion is, quote, the background law, is simply belied by the contract and by the 40 years of jurisprudence since that point. Assuming it did apply, then what? Well, it would apply. Assuming its principles apply, then what? If its principles – well, first of all, it was not a case in which the parent company was a – was in bankruptcy. So that matters because it relied on unjust enrichment, and unjust enrichment was dealt with by the Second Circuit in First Central. So you would still look and say, is there going to be unjust enrichment? I notice a certain skepticism. It says this must be explicit. Let's look at that. Instead of distinguishing it, I say let's assume it applies. Okay. And let's say it says the agreement must be explicit. Does it say that? No, it does not. It does not say that. It can be explained. The Bob Richards opinion obviously says it can be an express or an implied contract. And if it applied, the implication is that what this contract would then have to say is, the Bob Richards case, we adopt it, or we opt out of it. And what you have here is a case that uses California law and California principles, and it still talks about making and receiving payments as if they were filing separate tax returns. You can't reconcile that with the U.S. v. Rodriguez case. Rodriguez was a case in which the CEO of the parent company of a bank took a $3.4 million tax refund. He was charged with crimes. And this court in that case said the fact that that money was money that was ultimately owed to the bank doesn't mean that it was the bank's money, and therefore, there was no crime. He was convicted on a lot of other charges, but that one he got off on. So I don't see Bob Richards as being the kind of talisman that my colleague suggests it is. I think it is one of a number of cases, but I think it has to yield in the face of cases like U.S. v. Rodriguez, coupon clearing, North American coin, and a slew of others, as well as the Second Circuit's opinion in First Central. I don't think we have any other questions. Thank you, Your Honor. Thank you very much for your argument. You went over, but I'll give you 30 seconds. Your Honor, the Banksy court got one thing right. Net bank is directly on point. More importantly, the net bank court said the outcome of the instant case would not be different if the Bob Richards rule were applied. We don't know why the Eleventh Circuit didn't apply the Bob Richards rule, but the Eleventh Circuit wasn't bound by it. This court is. And if the Eleventh Circuit would have reached the same result under the Bob Richards rule as it did, that is that the holding company holds those refunds as an agent, this court should reach that decision here regardless of whether it looks at the interagency policy statement, because, of course, that's not relevant to the Bob Richards analysis. We also think, in closing, that the court could simply follow the analysis that was followed by net bank as an alternative. It's the inverse of net bank in this sense. Under our controlling decision, Bob Richards, we win, but under the net bank analysis, we also win. Thank you. Thank you, Your Honor. We appreciate both of you for your good arguments. Very interesting case, and we appreciate you helping us much in this case. It is Case 12-56218. It is now submitted.
judges: Fernandez, Smith, Murguia